# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| REEBOK INTERNATIONAL LTD., LLC, and REEBOK INTERNATIONAL LIMITED, | Case No. _____ |
| Plaintiffs, | **JURY TRIAL DEMANDED** |
| v. | |
| OLIVER CABELL, INC., | |
| Defendant. | |

Plaintiffs Reebok International Ltd. and Reebok International Limited (collectively, "Reebok"), through the undersigned counsel, bring this Complaint against Defendant Oliver Cabell, Inc. ("Oliver Cabell" or "Defendant") and allege as follows:

## INTRODUCTION

1.      Since its beginning, Reebok's brand has been rooted in innovation and quality. From the 1895 founding of its companion company, J.W. Foster & Sons, which pioneered the spiked running shoe, to the launch of the now-iconic Reebok Classics in the 1980s, to its continued innovation and production of high quality, high value footwear today, Reebok is—and has for decades been—a staple of the global footwear industry.

2.      Central to Reebok's brand identity are the Reebok Classics, a family of timeless designs first sold in the 1980s that have remained relevant and highly desired ever since.

3.      Among the first Reebok Classics released by Reebok was the CLASSIC LEATHER (pictured below), which Reebok launched in 1983 as a lightweight, all-leather running shoe that redefined sneaker style:



*The CLASSIC LEATHER*

4.    During the same period, in 1984, Reebok launched the WORKOUT PLUS (pictured below) as an all-purpose performance fitness shoe:



*The WORKOUT PLUS*

5.    And in 1985, following the success of its NEWPORT CLASSIC and ACT 600 tennis shoes, Reebok launched the CLUB C (pictured below), an everyday tennis shoe designed to be worn on or off the court:



*The CLUB C*

6.     Over the ensuing decades, the CLASSIC LEATHER, WORKOUT PLUS, and CLUB C (collectively, the "Reebok Classics") have evolved from fitness and club sneakers to lifestyle brands; versatile and timeless designs whose popularity has spanned generations.

7.     In fact, consumer devotion to these classic products is undeniable.  As just one example, Reebok consumers have online groups dedicated to the Reebok brand.

8.     Moreover, the simple fact that these products have been a staple of Reebok's business for approximately forty (40) years speaks volumes in an industry where the typical lifespan of a product is much shorter.

9.     Unsurprisingly, Reebok has therefore devoted significant time and resources over the last several decades to build upon the already significant goodwill in, and consumer recognition of, these classic products.

10.     As part of that effort, although Reebok has, and continues to, offer these classic sneakers in a variety of colors, Reebok has always consistently and prominently used its well-known trademarks and trade dresses to market, promote, offer to sell, and sell these beloved products.

11.     For example, since their launch, the CLASSIC LEATHER and CLUB C have consistently and prominently featured Reebok's iconic Stripecheck design trademark, which as depicted immediately below and discussed further in this Complaint, consists of a stylized cross-check overlapping intersecting stripes and for which Reebok owns multiple incontestable federal trademark registrations, including but not limited to U.S. Trademark Reg. Nos. 1,196,293 and 1,831,392 (the "Stripecheck Mark"):



*The Stripecheck Mark*

12.     Variations of the CLASSIC LEATHER and CLUB C have also consistently and prominently featured Reebok's well-known Crosscheck design trademark, which as depicted immediately below and discussed further in this Complaint, consists of the Reebok's stylized crosscheck, and for which Reebok has extensive, nationwide common law rights dating back at least as early as 1970 (the "Crosscheck Mark"):



13.     Similarly, since its inception, the WORKOUT PLUS has consistently and prominently featured Reebok's iconic H-Strap design mark, which is depicted immediately below and discussed further in this Complaint, and for which Reebok owns an incontestable federal trademark registration (U.S. Reg. No. 1,568,464) (the "H-Strap Mark"):



*The H-Strap Mark*

14.    In addition, Reebok's CLASSIC LEATHER, CLUB C, and WORKOUT PLUS—like many of Reebok's other products—have at all times since their launch consistently and prominently featured Reebok's unique and widely recognized Window Box design mark, which as depicted immediately below and discussed further in this Complaint, consists of a narrow rectangular inset box, and for which Reebok owns extensive, nationwide common law rights dating back to at least as early as 1981 (the "Window Box Mark"):

 

15.    Although consumer recognition of these iconic marks is alone sufficient to cause the public to associate these marks exclusively with Reebok and to call to mind Reebok's reputation for quality and excellence, Reebok further entrenches that recognition and association through the distinctive trade dresses Reebok has used for approximately forty (40) years in tandem with the sale, offer for sale, promotion, and advertisement of the CLASSIC LEATHER, CLUB C, and WORKOUT PLUS sneakers.

16.    For instance, the CLASSIC LEATHER prominently features Reebok's "CLASSIC LEATHER Trade Dress," which consists of a distinctive combination of the following source-identifying elements: (1) the Reebok Crosscheck Mark on the shoe upper with the Window Box Mark; (2) a stay bar connecting the toe cap to the eyestay; (3) a heel tab; (4) a wedge-shaped midsole in a single color or two colors; and (5) the placement and proportion of these elements in relation to each other.



*Reebok CLASSIC LEATHER Shoes*

17.     As shown immediately below, Reebok's CLUB C also features distinctive elements that together compose the "CLUB C Trade Dress," namely: (1) the Reebok Crosscheck Mark on the shoe upper with the Window Box Mark; (2) a flat sole and tapered midsole; (3) a groove with or without stitching just below where the midsole meets the upper; (4) a heel tab; (5) an extended toe cap; (6) a configuration of perforations on the vamp comprising eleven rows of three perforations each and one row on either end of two perforations each; and (8) the placement and proportion of these elements in relation to each other.





*Reebok CLUB C Shoes*

18.    And Reebok's WORKOUT PLUS has consistently featured the following design elements that form the "WORKOUT PLUS Trade Dress": (1) the Reebok H-Strap Mark on the shoe upper with the Window Box Mark; (2) a ¾ twin cup outsole that exposes the midsole in the center of the shoe; (3) a configuration of perforations on the vamp comprising nine columns of three perforations each; and (4) the placement and proportion of these elements in relation to each other.





*Reebok WORKOUT PLUS*

19.    The CLASSIC LEATHER Trade Dress, CLUB C Trade Dress, and WORKOUT PLUS Trade Dress are collectively referred to herein as the "Reebok Trade Dresses."

20.    With full knowledge of both Reebok's decades-old rights and the tremendous value and goodwill embodied in the Stripecheck Mark, H-Strap Mark, Crosscheck Mark, Window Box Mark, and the Reebok Trade Dresses, Oliver Cabell has recently embarked on a campaign designed to shortcut the hard work needed to build a new business and to instead propel itself to overnight success by trading off the goodwill embodied in Reebok's intellectual property.

21.    Specifically, as outlined below, Oliver Cabell is selling shoes designed to mimic Reebok's iconic trademarks and trade dresses, including but not limited the following three models:



| **OLIVER CABELL'S INFRINGING SHOES** | **REEBOK CLASSICS** |
|---|---|
| *Oliver Cabell "BBall Lo"* | *Reebok WORKOUT PLUS* |
| *Oliver Cabell "Vintage Runner"* | *Reebok CLASSIC LEATHER* |
| *Oliver Cabell "Vegan 481"* | *Reebok CLUB C* |

(Oliver Cabell's shoes shown above, collectively with all color and other variations of these three identified designs, are referred to herein as the "Infringing Shoes").

22.      As the side-by-sides above demonstrate, Oliver Cabell's copying of Reebok's shoes is not subtle or inadvertent; rather, Oliver Cabell is aggressively marketing and selling its blatant knockoff versions of Reebok's shoes, infringing Reebok's trademark and trade dress rights.

23.      As described more fully below, the Internet is replete with evidence of consumers calling Oliver Cabell out for its unlawful violation of Reebok's rights, including but not limited to social media posts such as the one below where consumers express confusion by posting things

like "Reebok" on Oliver Cabell's social media posts or express outrage and refer to Oliver Cabell's

shoes as "bootleg reebok":



24.     Yet Oliver Cabell's willful attempts to sow confusion to trade off Reebok's

goodwill are not limited to just infringement of Reebok's trademarks and trade dresses.

25.     For example, as noted above, Reebok's CLASSIC LEATHER shoe was originally

launched as a running shoe.  Unsurprisingly, Oliver Cabell has named its knock off version the

"Vintage Runner," drawing upon both the longevity and original purpose of the CLASSIC

LEATHER.

26.     Similarly, in June 2021, Reebok launched a sustainable, vegan shoe in connection

with its CLUB C line of products.  Conveniently, within a year of Reebok's announcement, Oliver

Cabell started selling and marketing its knock off of the CLUB C as purportedly sustainable,

referring to it as the "Vegan 481."

27.     With respect to Oliver Cabell's BBall Lo, Oliver Cabell's own website explicitly

states that this product is "[i]nspired by the iconic 1980's workout style"—a clear reference to

Reebok's WORKOUT PLUS.  The name BBall Lo is also a deliberate attempt to mimic the WORKOUT PLUS's positioning as a "court shoe."  Thus, Oliver Cabell all but admits to attempting to knock off Reebok's legitimate style —which was the quintessential workout shoe that came to fame in the 1980s—with the BBall Lo.

28.    Oliver Cabell's website also contains a number of other statements that make clear its infringing intent by associating its products with the 1980s launch dates of Reebok's Classics. For example, Oliver Cabell promotes its infringing Bball Lo and Vintage Runners as "celebrat[ing] the pivotal era in which sportswear was elevated from a niche product to lifestyle and fashion" and its Vegan 481 shoe as "[r]etro inspired."  Screen captures of the webpages on which Oliver Cabell sells the Infringing Shoes are attached as **Exhibit 1.**

29.    Reebok is unquestionably harmed by a competitor infringing its iconic marks and trade dresses in order to sell competing products by fostering and encouraging consumer confusion, deception, and mistake.

30.    Yet, as outlined more fully below, the harm Oliver Cabell's conduct causes to Reebok is exacerbated by, among other things, Oliver Cabell's reputation for poor quality products.  For instance, a visual inspection of Oliver Cabell's Vegan 481 shoe reveals, among other issues and defects: irregular and tight stitching on the eyestay that weakens the shoe upper material; a lumpy toe cap indicative of poor shoe upper and backing materials; and a lack of heel counter support, causing the shoe to wear out and to provide inconsistent fits between wears.

31.    The poor quality of Oliver Cabell's shoes and its customer service, among other things, is further reflected in the feedback and commentary provided by consumers on Oliver Cabell's social media accounts, all of which harms Reebok's reputation due to the false association with Reebok, created by Oliver Cabell's infringing conduct.

32.     Upon information and belief, Oliver Cabell has also relied on and intentionally made false and misleading statements regarding the geographic origin and quality of its shoes, including the Infringing Shoes, to unfairly compete with Reebok and deceive the public.

33.     Reebok therefore has no choice but to file this lawsuit to stop, and obtain redress for, Oliver Cabell's willful and intentional trademark and trade dress infringement, unfair competition, false designation of origin, and false advertising in violation of the Lanham Act, 15 U.S.C. § 1051 *et seq.*; unfair and deceptive trade practices in violation of Mass. Gen. Laws ch. 93A; and common law trademark infringement and unfair competition.

### THE PARTIES

34.     Plaintiff Reebok International Ltd., LLC is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 25 Drydock Avenue Boston, Massachusetts 02110.   Reebok International Ltd., LLC is the primary distributor of Reebok products in the United States.  It is also the licensee of the trademarks and trade dresses at issue in this lawsuit.

35.     Plaintiff Reebok International Limited is a corporation organized under the laws of the United Kingdom with a place of business at 11-12 Pall Mall, London SW1Y 5LU.  Reebok International Limited owns all rights, title, and interests in the Reebok trademarks, including the Crosscheck Mark, Window Box Mark, Stripecheck Mark, and H-Strap Marks, as well as the Reebok Trade Dresses asserted in this case.

36.     Upon information and belief, Defendant Oliver Cabell, Inc. is a Minnesota corporation with its principal place of business at 3340 Annapolis Lane North, Suite B, Plymouth, Minnesota 55447.   Oliver Cabell also operates a brick-and-mortar store at which it sells the

Infringing Shoes at 285 Lafayette Street, New York, New York 10012, and likewise sells its

Infringing Shoes through its publicly accessible webpages hosted at <olivercabell.com>.

## JURISDICTION AND VENUE

37.    This is a civil action seeking disgorgement of profits, injunctive relief, and

corrective advertising under federal, Massachusetts, and common law based upon Oliver Cabell's

willful acts of trademark and trade dress infringement, false designation of origin, unfair

competition, deceptive trade practices, and false advertising.

38.    This Court has original jurisdiction over this action pursuant to 15 U.S.C. § 1121(a),

28 U.S.C. § 1331, and 28 U.S.C. § 1338(b).

39.    This Court has jurisdiction over the pendant state law claims pursuant to 28 U.S.C.

§ 1367(a) because the state law claims are based upon the same or substantially the same conduct

by Defendant.

40.    This Court has personal jurisdiction over Oliver Cabell because Oliver Cabell has

engaged in substantial and regular business in the Commonwealth of Massachusetts and this

District, including by importing, distributing, marketing, offering for sale, and selling its goods

generally, as well as its Infringing Shoes specifically, to consumers and/or entities located within

Massachusetts.  Additionally, the Court has personal jurisdiction over Oliver Cabell based on

Oliver Cabell's ownership, maintenance, and use of Oliver Cabell's commercial webpages hosted

at the domain name <olivercabell.com>, which Oliver Cabell uses to not just solicit business from

individuals and entities residing in Massachusetts but also to sell its goods—including the

Infringing Shoes—to individuals and/or entities residing in Massachusetts.  Oliver Cabell's

website also interacts with consumers in Massachusetts by, among other things, providing the

opportunity to sign up for newsletters, which Oliver Cabell sends out at least daily (and sometimes

multiple times a day) and by encouraging individuals or entities to follow Oliver Cabell on social media, which promote, advertise, and sell Oliver Cabell's Infringing Shoes. Publicly available analytic tools, such as Google Trends, confirm that Massachusetts is the top jurisdiction driving traffic to the Oliver Cabell website. *See* **Exhibit 2**.

41.     Upon information and belief, Oliver Cabell and/or its agents also operate a fulfillment center and warehouse at 64 Jackson Road, Devens, Massachusetts 01434, at and from which Oliver Cabell stores and distributes the Infringing Shoes and other goods.

42.     Upon information and belief, Oliver Cabell is also aware that Reebok has a headquarters in Boston, Massachusetts as well as retail locations within the Commonwealth, meaning that the injury from Oliver Cabell's unlawful conduct would be felt significantly within this District.

43.     Oliver Cabell has therefore transacted business, contracted for the supply of services and things, and/or caused tortious injury in this Commonwealth, which actions give rise to Reebok's claims. And Defendant has further maintained an interest in, used, or possessed real property in this Commonwealth in furtherance of its tortious and infringing conduct, which also gives rise to Reebok's claims. Accordingly, the Court may exercise personal jurisdiction over Defendant under at least Mass. Gen. Laws ch. 223A, § 3(a)-(e).

44.     As detailed above, Oliver Cabell has further maintained purposeful minimum contacts with the Commonwealth of Massachusetts and this District related to Reebok's claims such that the exercise of personal jurisdiction over Oliver Cabell in this action comports with the requirements of the Due Process Clause.

45.     Venue is proper in this judicial district under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims asserted in this Complaint occurred in this

District and because a substantial part of the property that is the subject of this Complaint is situated in this District.

## FACTUAL BACKGROUND

### I.    REEBOK AND ITS FAMOUS BUSINESS

46.    Reebok is an industry-leading shoe and apparel company, known for its original, high-quality, and distinctive footwear and apparel.

47.    Although a mainstay of American culture, Reebok traces its roots to the United Kingdom in 1895, when Joseph William Foster—the grandfather of Reebok's co-founders, Jeff and Joe Foster—started his running shoes company, J.W. Foster & Sons, from his bedroom above his father's workshop in Bolton, England.

48.    J.W. Foster's running shoes were some of the earliest to feature spikes on the sole and soon became popular among athletes, including Olympic champion Harold Abrahams, who wore the shoes to his 1924 gold medal victory in the 100-meter sprint.

49.    Inspired by the success of their grandfather's company, in 1958, Jeff and Joe Foster formed Reebok, naming the company after the grey rhebok antelope, a symbol of speed and agility.

50.    Over the ensuing decades, Reebok continued to grow in the United Kingdom and soon caught the eye of American businessman Paul Fireman, who in 1979 negotiated a deal to license and sell Reebok-branded goods in the United States under Reebok USA Ltd.  Mr. Fireman so believed in the Reebok brand that he actually launched three new shoes to market that same year.

51.    Reebok's sales in the United States quickly took off, reaching more than $1.5 million in 1981, and $13 million by 1983—staggering amounts for the time.

52.     Building on the success of the Reebok brand in the United States, in 1984, Mr. Fireman acquired the Reebok-English parent company, moving the Reebok global headquarters to Massachusetts, where it has remained ever since.

53.     Today, due to the high demand for its shoes, Reebok sells its products through a variety of trade channels, including but not limited to Reebok's website; third-party e-commerce platforms; major fashion and streetwear brands such as SNS, SSENSE, End, and BAIT; department stores and retailers such as JD Sports, Nordstrom, Journeys, Tillys, Urban Outfitters, Rack City, and Famous Footwear; sporting goods and outdoor retailers such as Foot Locker and Dick's Sporting Goods; discount retailers such as DSW, TJ Maxx, and Ross; and Reebok's 59 retail stores throughout the United States.

54.     Consumers are therefore widely exposed to Reebok's products, and their associated trademarks and trade dresses, and have come to expect that they can purchase Reebok not only directly from the company itself but third parties as well.

55.     The company has also earned high praise both within and outside of the industry over the years.

56.     By way of example only, Reebok's parent company, Authentic Brands Group ("ABG"), recently won the prestigious "Company of the Year" award in 2021 from *Footwear News*, which hosts an annual ceremony often referred to as "The Shoe Oscars."  In giving ABG the award, *Footwear News* recognized ABG's acquisition of Reebok as "the biggest win" for the company."

57.     Reebok itself has also been recognized as 2014 Digital Marketer of the Year by the Footwear Distributors and Retailers of America, and Reebok received CLIO Sports awards in 2015, 2019, and 2020 for achievements in marketing and innovation.

58.    Reebok's footwear has also been recognized for its cutting-edge innovations and exceptional quality, and the Reebok Classics are no exception. For example, the CLASSIC LEATHER has earned *Women's Health*'s Best White Sneaker Award in 2022 and *Men's Health*'s 2021 Sneaker Award for best "retro" shoes, while the CLUB C 85 earned the 2019 award for best lifestyle shoe from the online magazine *SELF*.

59.    Praise for Reebok's innovative designs extends to its other products, as well.  For example, Reebok's NANO X1 running shoes have received numerous awards, including *Gear Patrol*'s 2021 Summer and Winter Gear Awards for best gym shoes; *GQ*'s and *Men's Health*'s 2021 Fitness Awards for best gym and best workout shoes, respectively; and *Good Housekeeping*'s 2022 Fitness Award for most versatile shoe.  Moreover, Reebok's FLOATRIDE RUN shoe received the 2017 "Best Debut" award from *Runner's World,* while its PUREMOVE sports bra earned praise as one of the "greatest innovations" (*Popular Science*) and "best inventions" (*TIME Magazine*) of 2018, and received awards from *Runner's World*, *Shape Magazine*, *SELF*, and *Women's Health*.  Copies of the press releases and articles describing the above awards, as well as other awards and industry praise for Reebok and its products, are attached as **Exhibit 3**.

## II.    REEBOK'S ICONIC TRADEMARKS AND TRADE DRESSES

60.    As described above, from its humble beginnings, Reebok has grown into one of the most popular and well-known footwear companies in the United States today.

61.    Reebok's iconic trademarks and distinctive trade dresses—including but not limited to the Window Box Mark, Stripecheck Mark, H-Strap Mark, Crosscheck Mark, and Reebok Trade Dresses at issue in this case—are a big part of that popularity, having been worn over the years by a wide variety of athletes and other celebrities, from tennis legends such as Boris Becker and John McEnroe, to basketball stars Shaquille O'Neal and Allen Iverson, to artists like Kendrick Lamar, Cardi B, Ariana Grande, and more.

62.     In an industry plagued by ever-changing fashion trends, Reebok has remained faithful to these core marks and trade dresses, using them consistently for decades and ensuring that they immediately convey to the public that the products being marketed, advertised, or sold in connection with those marks and trade dresses carry with them Reebok's reputation for authenticity, quality, versatility, and excellence.

63.     Independent sources have routinely commented on the "legacy and longevity" of Reebok's shoes, deeming Reebok's designs "certified classics when it comes to style, with numerous looks remaining relevant to a modern audience."[1]

64.     Reebok's classic designs—including those at issue in this Complaint—have only grown in popularity and recognition in recent years due to the renewed focus of consumers on 1980s, retro-inspired fashion.[2]

## III.     REEBOK'S CROSSCHECK AND STRIPECHECK TRADEMARKS

65.     As discussed above, Reebok's Crosscheck and Stripecheck Marks are part of the company's core branding identity.

66.     In fact, since at least as early as the 1970s, Reebok has continuously used the Crosscheck and Stripecheck Marks to promote, advertise, sell, and offer to sell its footwear and other apparel not just in the United States, but internationally as well.  Due to its brand recognition and substantial goodwill, Reebok has for four-plus decades used the Crosscheck and Stripecheck Marks across multiple Reebok shoe lines and in countless color combinations.  Examples of this use are pictured immediately below:

---

[1]     https://footwearnews.com/2021/shop/sneakers/classic-reebok-sneakers-1203214233/
[2]     https://www.whowhatwear.com/reebok-classics



*Reebok FLEXAGON FORCE*



*Reebok NANO X2*



*Reebok TRAIL CRUISER*



*Reebok LEGACY LIFTER II*



*Reebok CLASSIC LEATHER*



*Reebok CLUB C 85*

67.    Moreover, most pertinent here, the Crosscheck and Stripecheck Marks have for at least the last forty (40) years been prominently incorporated on the internal and external side panels of both Reebok's CLASSIC LEATHER and CLUB C shoes, as shown below:



68.    In the United States alone, Reebok has therefore sold hundreds of millions of shoes bearing the Stripecheck Mark, generating hundreds of millions of dollars in revenue.  Similarly, in the United States alone, Reebok has sold hundreds of millions of shoes bearing the Crosscheck Mark, generating hundreds of millions of dollars in revenue.

69.    In addition to capturing significant revenue and sales of products in tandem with the Crosscheck and Stripecheck Marks, Reebok has also devoted significant time and resources

into promoting, fostering, and maintaining brand recognition of the marks among consumers in the United States.

70.     For example, Reebok has spent many millions of dollars advertising the Crosscheck and Stripecheck Marks in the United States, including in print publications, television and Internet advertising, signage, in-store displays, and social media, among other advertising mediums. Reebok's advertisements and marketing efforts have reached billions of individual consumers during that time.

71.     Reebok also promotes products bearing the Crosscheck and Stripecheck Marks by collaborating with celebrities.  As one example, Grammy-award-winning artist Cardi B has a partnership with Reebok and can often be seen wearing Reebok shoes with the Crosscheck and Stripecheck Marks.  Representative photographs of Cardi B wearing and promoting shoes with the Crosscheck and Stripecheck Marks are reproduced below:



72.     Simply put, there is no question that, as a result of Reebok's promotional and sales efforts over the past four-plus decades, the Crosscheck and Stripecheck Marks are two of the most recognizable, iconic, and valuable trademarks in the footwear industry.  Due to Reebok's efforts,

consumers readily identify products bearing the Crosscheck and Stripecheck Marks as being high quality merchandise emanating from, sponsored by, or approved by Reebok.

73.    Reebok therefore has extensive, decades-old, nationwide common law rights in both the Crosscheck and Stripecheck Marks, and has enjoyed those rights long before Oliver Cabell began engaging in the conduct discussed in this complaint.

74.    Reebok has also obtained multiple registrations for the Stripecheck Mark, including but not limited to registrations on the Principal Register of the U.S. Patent and Trademark Office ("USPTO").  For example, Reebok owns the following registrations for the Stripecheck Mark in connection with shoes and/or footwear in the United States:

| Trademark | U.S. Reg. No. | Reg. Date | Relevant Goods/Services |
|---|---|---|---|
|  | 1,196,293 | May 25, 1982 | *Class 25*: Shoes |
|  | 1,831,392 | April 19, 1994 | *Class 25*: Footwear |

75.    Each of these registrations is valid and subsisting on the Principal Register, and has been since their respective registration dates. Each of the above registrations have also obtained incontestable status and are therefore conclusive evidence of the validity of the mark, Reebok's ownership of the mark, and Reebok's exclusive right to use the mark in connection with footwear in the United States.   Copies of the Certificates of Registration and current TESS/TSDR information for the above marks are attached as **Exhibit 4** (Reg. No. 1,196,293) and **Exhibit 5 (**Reg. No. 1,831,392).

76.    In addition to the above registrations, Reebok has also adapted the Stripecheck Mark to promote Reebok's other apparel and products using the following "Vector Logo":



77.    Reebok owns additional U.S. Trademark Registrations for the Vector Logo, some of which are incontestable, including but not limited to U.S. Reg. No. 6,694,415 (issued April 5, 2022), No. 2,309,329 (issued January 18, 2000), and No. 2,309,105 (issued January 18, 2000). Copies of the Certificates of Registration and TESS/TSDR information for each of these marks are attached collectively as **Exhibit 6**.

78.    As a result of Reebok's efforts, the public recognizes and understands that the Crosscheck Mark, Stripecheck Mark, and related Vector Logo distinguish and identify Reebok's products.  As just an example, third-party publications and media reports have referred to Reebok's Vector Logo, which is based on the Stripecheck Mark, as an "iconic mark," and the "legendary vector logo." *See* **Exhibit 7**.

79.    Accordingly, thanks to Reebok's dedication to providing high quality, original, and authentic footwear and apparel using the Crosscheck Mark, Stripecheck Mark, and related Vector Logo, as well its extensive marketing and years of hard work, Reebok has built up and now owns significant and valuable goodwill that is symbolized by the Crosscheck and Stripecheck Marks. Consumers recognize the Crosscheck and Stripecheck Marks as source identifiers that are uniquely associated with Reebok and genuine Reebok brand products.

## IV.    THE WINDOW BOX MARK

80.    Along with the Crosscheck and Stripecheck Marks, the Window Box Mark has become synonymous with Reebok and its high-value products.

81.    In fact, since at least as early as the 1980s, Reebok has continuously used the Window Box Mark to promote, advertise, sell, and offer to sell its footwear not just in the United States, but internationally as well.  Due to its brand recognition and substantial goodwill, Reebok has for four-plus decades used the Window Box Mark across multiple shoe lines and in countless color combinations.  Examples of this use are pictured immediately below:



*Reebok CLASSIC LEATHER*



*Reebok CLUB C*



*Reebok WORKOUT PLUS*



*Reebok PRINCESS*



*Reebok FREESTYLE HI Toddler*



*Reebok Cardi B FREESTYLE HI*

82.    Moreover, most pertinent here, the Window Box Mark has for at least the last forty
(40) years been prominently incorporated on the external side panels of both Reebok's CLASSIC
LEATHER, CLUB C, and WORKOUT PLUS shoes, as shown below:





83.    In the United States alone, Reebok has therefore sold half a billion shoes bearing
the Window Box Mark, generating over half a billion dollars in revenue.

84.    In addition to capturing significant revenue and sales of products in tandem with
the Window Box Mark, Reebok has also devoted significant time and resources into promoting,
fostering, and maintaining brand recognition of the mark among consumers in the United States.

85.    For example, Reebok has spent many millions of dollars advertising the Window
Box Mark in the United States, including in print publications, television and Internet advertising,
signage, in-store displays, and social media, among other advertising mediums.    Reebok's
advertisements and marketing efforts have reached billions of individual consumers during that
time.

86.    Reebok also promotes products bearing the Window Box Mark by collaborating with celebrities.  As just one example, Reebok has partnered with Ariana Grande, and she has been frequently seen in shoes bearing the Window Box Mark, as shown below.



87.    Reebok's partner, Cardi B, has also promoted shoes prominently bearing the Window Box Mark, as shown in the below representative image.



88.    Although the Window Box Mark is often used in conjunction with the word mark REEBOK and an image of the Union Jack flag (the "REEBOK Union Jack Mark"), Reebok has used the Window Box Mark both with and without the REEBOK Union Jack Mark and with no insert at all, as shown in the below examples:

    

*Reebok Jurassic World Club C*          *Reebok POPSICLE WORKOUT PLUS*

89.    Reebok has also used the Window Box Mark to highlight the other brands and companies with whom it has collaborated.  For example, streetwear brand LQQK Studio has collaborated with Reebok on the below CLASSIC LEATHER design that prominently displays the LQQK brand in the Window Box Mark:



90.    Simply put, there is no question that, as a result of Reebok's promotional and sales efforts over the past four-plus decades, the Window Box Mark was and is a highly recognized,

significantly valuable mark that belongs to Reebok.  Due to Reebok's efforts, consumers readily identify products bearing the Window Box Mark as being high quality merchandise emanating from, sponsored by, or approved by Reebok.

91.    As a result of Reebok's efforts, the public recognizes and understands that the Window Box Mark distinguishes and identifies Reebok's products.

92.    Accordingly, thanks to Reebok's dedication to providing high quality, original, and authentic footwear and apparel using the Window Box Mark, as well its extensive marketing and years of hard work, Reebok has built up and now owns significant and valuable goodwill that is symbolized by the Window Box Mark.  Consumers recognize the Window Box Mark as a source identifier that is uniquely associated with Reebok and genuine Reebok brand products.

93.    Reebok therefore has extensive, decades-old, nationwide common law rights in the Window Box Mark, and has enjoyed those rights long before Oliver Cabell began engaging in the conduct discussed in this complaint.

## V.    REEBOK'S CLASSIC LEATHER TRADE DRESS

94.    As explained above, first launched as the "Classic" in 1983, Reebok's CLASSIC LEATHER shoe was introduced as a lightweight running shoe that sacrificed neither quality nor style.

95.    The CLASSIC LEATHER prominently features Reebok's "CLASSIC LEATHER Trade Dress," which consists of a distinctive combination of the following source-identifying elements: (1) the Reebok Crosscheck Mark on the shoe upper with the Window Box Mark; (2) a stay bar connecting the toe cap to the eyestay; (3) a heel tab; (4) a wedge-shaped midsole in a single color or two colors; and (5) the placement and proportion of these elements in relation to each other.



*Reebok CLASSIC LEATHER Shoes*

96.     Since first introducing the CLASSIC LEATHER in the 1980s, Reebok has continuously used the CLASSIC LEATHER Trade Dress without interruption in connection with that shoe.

97.     In fact, although over the years Reebok has sold and promoted hundreds of colorways and design iterations within the CLASSIC LEATHER franchise, the CLASSIC LEATHER Trade Dress is always featured and is therefore widely recognized by the public, immediately triggering in the minds of consumers that products bearing that trade dress originate from, are sponsored by, affiliated with, approved of, or in some other way connected to Reebok. A small fraction of the colorways and iterations that bear the CLASSIC LEATHER Trade Dress are depicted below:





98.    This widespread recognition of, and consumer goodwill embodied in, the CLASSIC LEATHER Trade Dress is unsurprising and exhibited in a variety of ways.

99.    Like its trademarks discussed in this Complaint, Reebok has spent decades and hundreds of millions of dollars promoting the CLASSIC LEATHER Trade Dress through a wide variety of traditional and non-traditional means, including streaming services such as Hulu, Spotify, and Pandora; internet and social media advertising; and celebrity and influencer endorsements, to name a few.

100.    Representative advertisements published over the decades for Reebok shoes bearing the CLASSIC LEATHER Trade Dress are reproduced below:







101.    In the United States alone, Reebok has sold hundreds of millions of shoes bearing the CLASSIC LEATHER Trade Dress, and Reebok's U.S. sales of footwear bearing the CLASSIC LEATHER Trade Dress have accounted for hundreds of millions of dollars in revenue.

102.    The CLASSIC LEATHER Trade Dress has garnered unsolicited and/or unpaid media attention over the years.

103.    For example, as reported by *Page Six* in March 2022, celebrities, such as *Euphoria*'s Sydney Sweeney, musician Joe Jonas, The Duchess of Sussex Megan Markle, and

actor Reese Witherspoon "can't get enough of Reebok's classic white sneakers," *i.e.*, the CLASSIC LEATHER shoes, as evidenced by the pictures below.

   

104.    Similarly, *E News* has described the CLASSIC LEATHER as "iconic sneakers;" *SHAPE* has remarked that the CLASSIC LEATHER "remains, well, a classic" because "they look cool with just about anything;" and an article in *The Source Magazine* observed that the "Classic Leather, is an iconic design that has lasted the test of time . . . ."

105.    This type of coverage is not new.  For example, in 2017, well before Oliver Cabell launched, *Sneaker News* described the CLASSIC LEATHER and CLUB C as "two of [Reebok's] most iconic silhouettes," a sentiment echoed by *Hypebeast* in 2016.  Copies of the above articles describing the distinctiveness of the CLASSIC LEATHER Trade Dress are attached collectively as **Exhibit 8**.

106.    In addition, Reebok's CLASSIC LEATHER Trade Dress has appeared in a variety of television shows and movies.  By way of example only, several characters in the hit Netflix series *Stranger Things* have worn the CLASSIC LEATHER, as shown below:







107.    The entrenchment of the CLASSIC LEATHER Trade Dress in the mind of consumers has only been further solidified by Reebok's collaboration with other well-known, highly influential designers, companies, or celebrities.

108.    For example, Reebok has released CLASSIC LEATHER colorways and designs that incorporate the CLASSIC LEATHER Trade Dress through high profile collaborations with Eames Office, Annuel AA, MADWOMEN, and LQQK Studios.

109.    These collaborations and limited-run releases have given Reebok's CLASSIC LEATHER shoes—as well as the Crosscheck Mark, Stripecheck Mark, Window Box Mark, and CLASSIC LEATHER Trade Dress they embody—a coveted level of prestige and helped further increase popularity of the shoes with new generations and demographics.

110.    In fact, it is not at all unusual for these limited run CLASSIC LEATHER shoes to sell out in minutes after they are released.

111.    Reebok has even collaborated with popular children's program *Peppa Pig* to design a CLASSIC LEATHER for children, extending its reach in popular culture.



112.    Simply put, nearly 40 years since the introduction of the CLASSIC LEATHER shoe, the CLASSIC LEATHER Trade Dress remains immensely popular and continues to grow in popularity.

113.    The CLASSIC LEATHER Trade Dress is distinctive, and the public recognizes and understands that the CLASSIC LEATHER Trade Dress distinguishes and identifies genuine Reebok brand shoes.

114.    As a result of Reebok's extensive use of the CLASSIC LEATHER Trade Dress, Reebok has built up and now owns extremely valuable goodwill that is embodied by the CLASSIC LEATHER Trade Dress.

115.    The CLASSIC LEATHER Trade Dress therefore enjoys significant secondary meaning as a source identifier of Reebok and has since long before Oliver Cabell adopted its Infringing Shoes.

116.    In fact, Oliver Cabell's attempts to knock off the CLASSIC LEATHER Trade Dress alone supports a finding that Reebok's trade dress enjoys secondary meaning.

## VI.    REEBOK'S CLUB C TRADE DRESS

117.    As noted above, Reebok first launched its CLUB C shoe in 1985.

118.    Reebok released the CLUB C as the everyday tennis player's shoe, maintaining a traditional tennis styling while utilizing Reebok's signature material and design elements, including the iconic Crosscheck Mark.

119.    At the time of the CLUB C's launch, Reebok also developed and began using the "CLUB C Trade Dress," which consists of a distinctive combination of the following source-identifying elements:  (1) the Reebok Crosscheck Mark on the shoe upper with the Window Box Mark; (2) a flat sole and tapered midsole; (3) a groove with or without stitching just below where the midsole meets the upper; (4) a heel tab; (5) an extended toe cap; (6) a configuration of perforations on the vamp comprising eleven rows of three perforations each and one row on either end of two perforations each; and (7) the placement and proportion of these elements in relation to each other.





*Reebok CLUB C Shoes*

120.    Since first introducing the CLUB C in the 1980s, Reebok has continuously manufactured, sold, and promoted shoes bearing the CLUB C Trade Dress.

121.    Reebok also offers and promotes a vegan shoe option as part of its CLUB C line.

122.    Since first introducing the CLUB C sneaker, Reebok has sold and promoted hundreds of colorways and design iterations within the CLUB C franchise, all the while featuring the same distinctive CLUB C Trade Dress.  The CLUB C Trade Dress is therefore widely recognized by the public, immediately triggering in the minds of consumers that products bearing that trade dress originate from, are sponsored by, affiliated with, approved of, or some other way connected to Reebok.  A small fraction of the colorways and iterations that bear the CLUB C Trade Dress are depicted below:





123.    This widespread recognition of, and consumer goodwill embodied in, the CLUB C Trade Dress is unsurprising and exhibited in a variety of ways.

124.    Like trademarks identified in this Complaint, Reebok has spent decades and hundreds of millions of dollars promoting the CLUB C Trade Dress through a wide variety of traditional and non-traditional means, including streaming services such as Hulu, Spotify, and Pandora; internet and social media advertising; and celebrity and influencer endorsements, to name a few.

125.    Representative advertisements published over the decades for Reebok shoes bearing the CLUB C Trade Dress are reproduced below:





126.    In the United States alone, Reebok has sold hundreds of millions of shoes bearing the CLUB C Trade Dress, and Reebok's U.S. sales of footwear bearing the CLUB C Trade Dress have accounted for hundreds of millions of dollars in revenue.

127.    The CLUB C Trade Dress has also garnered unsolicited and/or unpaid media attention over the years.

128.    For example, *Footwear News* described the CLUB C as a "timeless model" and "certified classic that complements any outfit thanks to its clean leather upper, vintage aesthetic, and archival branding," while *Reviewed* called the CLUB C "inescapable" and an "attractive go-to for sneakerheads, trendy hipsters, and streetwear junkies alike."    And fashion website

*Highsnobiety* referred to the CLUB C as "iconic" and "one of Reebok's most celebrated silhouettes."

129.    Years before Oliver Cabell existed, third party commentators lauded the CLUB C Trade Dress as a distinctive and instantly recognizable design.  For example, in 2017, *Hypebae* called the CLUB C "one of Reebok's most recognizable and iconic silhouettes."  Copies of the above articles describing the distinctiveness of the CLUB C Trade Dress are attached collectively as **Exhibit 9**.

130.    Over the years, shoes bearing Reebok's CLUB C Trade Dress have been worn and popularized by countless athletes, pop stars, rappers, artists, and other influential celebrities, including Emily Ratajkowski, Zendaya, Cardi B, Ariana Grande, Addison Rae, Gigi Hadid, Brie Larson, Lucy Hale, Camila Mendes, and Whitney Port.

131.    The entrenchment of the CLUB C Trade Dress in the mind of consumers has only been further solidified by Reebok's collaboration with other well-known, highly influential designers, companies, or celebrities.

132.    For example, Reebok has released CLUB C colorways through high profile collaborations with Eames Office, Danielle Guizio, JJJJound, Maison Margiela, Braindead, Eames Office, and Victoria Beckham, to name a few.

133.    In addition, Reebok's CLUB C Trade Dress has become part of popular culture by, for example, collaborating with popular television programs and film franchises such as *Looney Tunes*, *The Flintstones*, and *Jurassic Park* to release inspired CLUB C designs.



*Looney Tunes CLUB C*                    *Jurassic World CLUB C*



*The Flintstones CLUB C*

134.    The combination of elements comprising the CLUB C Trade Dress is distinctive, and the public recognizes and understands that the CLUB C Trade Dress distinguishes and identifies genuine Reebok brand shoes.  As a result of Reebok's extensive use of the CLUB C Trade Dress, Reebok has built up and now owns extremely valuable goodwill that is embodied by the CLUB C Trade Dress.

## VII.    REEBOK'S H-STRAP MARK AND WORKOUT PLUS TRADE DRESS

135.    Reebok released the WORKOUT in 1984, as a companion to Reebok's famous FREESTYLE shoe for women.

136.    Following the success of the WORKOUT, in 1987, Reebok launched the WORKOUT PLUS, which built on the performance and style of the WORKOUT, and the iconic design has remained a Reebok Classic ever since.

137.    One of the most recognizable features of Reebok's WORKOUT PLUS shoes is Reebok's prominent and well-recognized H-Strap Mark, which adorns the internal and external side panels of the shoes, as shown below:



138.    Reebok first placed the H-Strap Mark on its WORKOUT and WORKOUT PLUS shoes at least as early as 35 years ago, and Reebok has consistently used it since.

139.    The H-Strap Mark has therefore become an unmistakable—and instantly recognizable—hallmark of the Reebok brand.

140.    In fact, in the United States alone, Reebok has sold hundreds of millions of shoes bearing the H-Strap Mark, and Reebok's U.S. sales of footwear bearing the H-Strap Mark have accounted for hundreds of millions of dollars in revenue.

141.    Reebok has devoted significant resources over 35 years to advertising and promoting its products bearing the H-Strap Mark.  Over this period, Reebok has spent many millions of dollars advertising the H-Strap Mark, including in print publications, television and Internet advertising, signage, in-store displays, and social media, among other advertising mediums.  Reebok's advertisements and marketing efforts have reached billions of individual consumers during that time.

142.    Reebok also promotes products bearing the H-Strap Mark by collaborating with celebrities. As one example, famed rap artist Gucci Mane partnered with Reebok and can often be seen wearing Reebok's WORKOUT PLUS shoes with the H-Strap Mark. Representative photographs of Gucci Mane wearing shoes with the H-Strap Mark are reproduced below:



143.    As a result of Reebok's promotional and sales efforts over the approximately past four decades, the H-Strap Mark is an instantly recognizable and significantly valuable source identifier of Reebok. Due to Reebok's efforts, consumers readily identify products bearing the H-Strap Mark as being high quality merchandise emanating from, sponsored by, or approved by Reebok.

144.    In addition to its common law rights in the H-Strap Mark, Reebok has registered the H-Strap Mark on the Principal Register of the U.S. Patent and Trademark Office. For use of the H-Strap Mark on footwear, Reebok International Limited owns all right, title, and interest in U.S. Trademark Registration No. 1,568,464, as depicted below:



145.    A copy of the Certificate of Registration and TESS/TSDR information for U.S. Trademark Reg. No. 1,568,464 (the "H-Strap Registration") is attached as **Exhibit 10**.  The H-Strap Registration is valid and subsisting on the Principal Register of the United States Patent and Trademark Office and has been since its registration date on November 28, 1989.

146.    The H-Strap Registration is incontestable.  As such, the H-Strap Registration is conclusive evidence of the validity of the H-Strap Mark, Reebok's ownership of the H-Strap Mark, and Reebok's exclusive right to use the H-Strap Mark in connection with footwear in the United States.

147.    As a result of Reebok's efforts, the public recognizes and understands that the H-Strap Mark distinguishes and identifies Reebok's products.  As just an example, independent third party *Sneakers Mag* has described the H-Strap Mark as "iconic."  *See* **Exhibit 11**.

148.    Accordingly, thanks to Reebok's dedication to providing high quality, original, and authentic footwear and apparel using the H-Strap Mark, as well its extensive marketing and years of hard work, Reebok has built up and now owns significant and valuable goodwill that is symbolized by the H-Strap Mark.  Consumers recognize the H-Strap Mark as a source identifier that is uniquely associated with Reebok and genuine Reebok brand products.

149.    Reebok's "WORKOUT PLUS Trade Dress" consists of a distinctive combination of source-identifying elements, including: (1) the Reebok H-Strap Mark on the shoe upper with the Window Box Mark; (2) a ¾ twin cup outsole that exposes the midsole in the center of the shoe;

(3) a configuration of perforations on the vamp comprising nine columns of three perforations each; and (4) the placement and proportion of these elements in relation to each other.



*Reebok WORKOUT PLUS*

150.    Since first introducing the WORKOUT PLUS in the 1980s, Reebok has manufactured, sold, and promoted shoes bearing the WORKOUT PLUS Trade Dress.

151.    Reebok has sold and promoted hundreds of colorways and design iterations within the WORKOUT PLUS franchise, all the while featuring the same distinctive WORKOUT PLUS Trade Dress.  The WORKOUT PLUS Trade Dress is therefore widely recognized by the public, immediately triggering in the minds of consumers that products bearing that trade dress originate from, are sponsored by, affiliated with, approved of, or connected in some other way to Reebok.

A small fraction of the colorways and iterations that bear the WORKOUT PLUS Trade Dress are depicted below:



152.    This widespread recognition of, and consumer goodwill embodied in, the WORKOUT PLUS Trade Dress is unsurprising and exhibited in a variety of ways.

153.    Like the H-Strap Mark, Reebok has spent decades and hundreds of millions of dollars promoting the WORKOUT PLUS Trade Dress through a wide variety of traditional and

non-traditional means, including internet and social media advertising and celebrity and influencer endorsements, to name a few.

154. Representative advertisements published over the decades for Reebok shoes bearing the WORKOUT PLUS Trade Dress are reproduced below:





155. In the United States alone, Reebok has sold hundreds of millions of shoes bearing the WORKOUT PLUS Trade Dress, and Reebok's U.S. sales of footwear bearing the WORKOUT PLUS Trade Dress have accounted for hundreds of millions of dollars in revenue.

156. The WORKOUT PLUS Trade Dress has also garnered unsolicited and/or unpaid media attention over the years.

157. For example, fashion and streetwear magazine *Hypebeast* described the WORKOUT PLUS as a "classic design," while *Footwear News* has called the WORKOUT PLUS "timeless as a style staple," and fashion blog *F2Fashions* described the shoes' silhouette as "iconic."

158. Before Oliver Cabell even marketed its Infringing Shoes, independent and unpaid media outlets described the WORKOUT PLUS as "[q]uite possibly one of the most recognizable

silhouettes in the world," and an "iconic . . . fashion staple." Copies of the above articles discussing the distinctiveness of the WORKOUT PLUS Trade Dress are attached collectively as **Exhibit 12**.

159.   Over the years, shoes bearing Reebok's WORKOUT PLUS Trade Dress have been worn and popularized by countless athletes, pop stars, rappers, artists, and other influential celebrities, including A$AP Rocky, Lil Yachty, and Myles Garrett.

160.   The entrenchment of the WORKOUT PLUS Trade Dress in the mind of consumers has only been further solidified by Reebok's collaboration with other well-known, highly followed designers, companies, and celebrities.

161.   For example, Reebok has released WORKOUT PLUS colorways through high profile collaborations with rap group Hot Boys in the 1990s and celebrities JJ Watts and Gucci Mane in the present day, as well as contemporary brands and designers such as Foot Patrol, OFFSPRING, BAIT, and Awake NY, to name a few.

162.   The combination of elements comprising the WORKOUT PLUS Trade Dress is distinctive, and the public recognizes and understands that the WORKOUT PLUS Trade Dress distinguishes and identifies genuine Reebok brand shoes. As a result of Reebok's extensive use of the WORKOUT PLUS Trade Dress, Reebok has built up and now owns extremely valuable goodwill that is embodied by the WORKOUT PLUS Trade Dress.

## VIII.   REEBOK'S REPUTATION FOR QUALITY AND THE GOODWILL EMBODIED IN ITS TRADEMARKS AND TRADE DRESS

163.   Reebok maintains strict quality control standards for its footwear. Reebok goes to great lengths to ensure that its genuine Reebok products are designed for durability, performance, and comfort, and that they are inspected and approved by Reebok prior to distribution and sale.

164.    These efforts include performing testing of all shoes during and after the design and manufacturing process to ensure that they meet Reebok's standards for quality, durability, and value for money.

165.    Reebok submits both the materials used in its shoes and the shoes themselves to a battery of tests, including aging tests, bonding tests, seam tests, rain tests, flex tests, slip tests, sun tests, and many others.

166.    Reebok consistently polices and confirms the quality of the shoes being produced by its manufacturing partners.

167.    Due to these efforts by Reebok, consumers and potential purchasers have come to expect high quality goods from Reebok and such trust is reinforced when they see high quality Reebok shoes in public.

168.    Reebok not only strictly monitors the quality of the products that it sells, but also carefully determines where the products are released, when the products are released, and how the products are released.

169.    For example, within the Reebok Classics, Reebok builds demand for the CLASSIC LEATHER, CLUB C, and WORKOUT PLUS by introducing new collaborations, colorways, and designs of each shoe in rotating cycles, thereby avoiding market saturation.

170.    Reebok also carefully selects the fashion brands, designers, celebrities, and influencers with whom it collaborates to reach specific consumers and deliver a message that is consistent with the Reebok brand.

171.    Reebok has painstakingly developed over many decades a brand strategy that appeals to both consumers intent on making a statement and consumers focused on classic, clean designs, bridging the gap between generations and taste preferences.

172.    The Reebok Classics, including the CLASSIC LEATHER, CLUB C, and WORKOUT PLUS, are central to Reebok's marketing efforts, providing opportunities for both creative statement designs and classic, white sneaker looks.

173.    The Reebok Classics also embody Reebok's image as a lifestyle brand, providing high quality, high value shoes that can be worn to any occasion and work with any outfit.

## IX.    OLIVER CABELL'S UNLAWFUL USE OF REEBOK'S INTELLECTUAL PROPERTY

174.    In contrast to Reebok, Oliver Cabell sought to skip the significant investments required to develop original, authentic, and high-quality shoes, and instead chose to free-ride off Reebok's reputation and popularity, all while deceiving its customers.

175.    Oliver Cabell has done, and continues to do, so by developing, advertising, offering to sell, and selling copycat versions of Reebok's iconic CLASSIC LEATHER, CLUB C, and WORKOUT PLUS shoes, using identical and/or virtually identical versions of Reebok's iconic Crosscheck, Stripecheck, Window Box, and H-Strap Marks as well as the CLASSIC LEATHER Trade Dress, CLUB C Trade Dress, and WORKOUT PLUS Trade Dress, which Oliver Cabell sells in direct competition to Reebok and those with whom Reebok partners.

### A.    The Infringing "BBall Lo"

176.    As shown below, Oliver Cabell's Bball Lo is a knock off of Reebok's WORKOUT PLUS, blatantly copying both Reebok's iconic H-Strap and Window Box Marks as well as the WORKOUT PLUS Trade Dress that consumers associate with Reebok:



| *Oliver Cabell "BBall Lo"* | *Reebok WORKOUT PLUS* |

177. Indeed, as shown in the above comparison, the BBall Lo includes a virtually identical H-Strap Mark, which—like Reebok—emanates diagonally from the heel counter and the midsole, up the sidewall of the shoe upper and overlapping the first and fourth eyelet in the eyestay, through which the laces are threaded, with a stripe running underneath the H-Strap from the toe cap to the heel tab.

178. The Bball Lo also copies the other elements of the WORKOUT PLUS Trade Dress, including the Window Box Mark on the H-Strap Mark, which, as discussed above, Reebok has used both with and without the REEBOK Union Jack Mark in many of its classic designs.

179. The BBall Lo further mimics the ¾ twin cup outsole that exposes the midsole in the center of the shoe:



180. And although the perforations on the vamp of the Bball Lo do not comprise nine columns of three perforations each, they include the same configuration of perforations found in the CLUB C, further demonstrating that Oliver Cabell has intentionally copied Reebok's designs.

181.    In total, Oliver Cabell's infringing Bball Lo shoe imitates every aspect of the WORKOUT PLUS Trade Dress, as illustrated below and in the above comparisons:

| Reebok's WORKOUT PLUS Trade Dress | Infringing Bball Lo Shoes |
|---|---|
| H-Strap Mark on the Shoe Upper with Window Box Mark | Yes (use of confusingly similar marks) |
| ¾ Twin Cup Outsole | Yes |
| Perforation Configuration | Yes (copies CLUB C) |
| Placement and Proportion of Elements in Relation to Each Other | Yes |

182.    In doing so, Oliver Cabell guarantees that consumers encountering the BBall Lo either at point of sale or in the post-sale context are substantially likely to be confused, mistaken, and/or deceived as to the source, sponsorship, affiliation, and/or other relationship between Reebok and its Window Box Mark, H-Strap Mark, and WORKOUT PLUS Trade Dress, on the one hand, and Oliver Cabell and its BBall Lo, on the other hand.

**B.    The Infringing "Vintage Runner"**

183.    Oliver Cabell's blatant and intentional infringement campaign also extends to its Vintage Runner shoes, which, as shown below, are a blatant knock off of Reebok's beloved CLASSIC LEATHER line, copying Reebok's core-brand Crosscheck, Stripecheck, and Window Box Marks, as well as the CLASSIC LEATHER Trade Dress:



*Oliver Cabell "Vintage Runner"*    *Reebok CLASSIC LEATHER*

184.    As shown above, Oliver Cabell's infringing shoe mimic's Reebok's Crosscheck, Stripecheck, and Window Box Marks in a number of ways, including by incorporating a

Crosscheck overlay emanating from the eyestay down the sidewall of the shoe upper that overlaps a stripe running from the toe cap to the heel tab.

185.    Oliver Cabell's Vintage Runner also copies virtually all of the elements that make up the CLASSIC LEATHER Trade Dress.

186.    For example, the Vintage Runner includes a nearly identical placement and dimensions of the Window Box Mark found in the CLASSIC LEATHER Trade Dress.

187.    As shown below, the Vintage Runner also copies or mimics the same (1) stay bar connecting the toe cap to the eyestay; (2) heel tab; and (3) a wedge-shaped midsole in a single color or two colors; as well as the same placement and proportion of these elements in relation to each other:



188.    In total, Oliver Cabell's infringing Vintage Runner shoe imitates the overall commercial impression created by the CLASSIC LEATHER Trade Dress, as well as the individual components of the CLASSIC LEATHER Trade Dress, as illustrated below and in the above comparisons:

| Reebok's CLASSIC LEATHER Trade Dress | Infringing Vintage Runner Shoes |
|---|---|
| Crosscheck Mark on the Shoe Upper with Window Box Mark | Yes (use of confusingly similar marks) |
| Stay Bar | Yes |
| Heel Tab | Yes |
| Wedge-shaped midsole in a single color or two colors | Yes |
| Placement and Proportion of Elements in Relation to Each Other | Yes |

189.    In doing so, Oliver Cabell guarantees that consumers encountering the Vintage Runner either at point of sale or in the post-sale context are substantially likely to be confused, mistaken, and/or deceived as to the source, sponsorship, affiliation, and/or other relationship between Reebok and its Crosscheck Mark, Window Box Mark, Stripecheck Mark, and CLASSIC LEATHER Trade Dress, on the one hand, and Oliver Cabell and its Vintage Runner, on the other hand.

**C.    The Infringing "Vegan 481"**

190.    Oliver Cabell's intentional infringement of Reebok's trade dress and trademark rights is only further confirmed by its blatant imitation of Reebok's CLUB C shoe with its infringing Vegan 481 shoe, which as shown below again copies the Crosscheck, Stripecheck, and Window Box Marks as well as the CLUB C Trade Dress.



| *Oliver Cabell "Vegan 481"* | *Reebok CLUB C* |

191.    Indeed, as with the Vintage Runner, the Crosscheck and Stripecheck Marks on the CLUB C and the infringing Vegan 481 both include a Crosscheck overlay emanating from the eyestay down the sidewall of the shoe upper that overlaps a stripe, as well as the Window Box Mark.

192.    The Vegan 481 shoe also copies the other elements of the CLUB C Trade Dress, incorporating (1) a flat sole and tapered midsole; (2) a groove with or without stitching just below where the midsole meets the upper; (3) a heel tab; (4) heel counter stitching; (5) an extended toe

cap; (6) a configuration of perforations on the vamp comprising eleven rows of three perforations each and one row on either end of two perforations each; and (7) the placement and proportion of these elements in relation to each other:



193.    In total, Oliver Cabell's infringing Vegan 481 shoe imitates the overall commercial impression created by the CLUB C Trade Dress, as well as the individual components of the CLUB C Trade Dress, as illustrated below and in the above comparisons:

| Reebok's CLUB C Trade Dress | Infringing Vegan 481 Shoes |
|---|---|
| Crosscheck Mark on the Shoe Upper with Window Box Mark | Yes (use of confusingly similar marks) |
| Flat Sole and Tapered Midsole | Yes |
| A Groove with or without Stitching Just Below Where the Midsole Meets the Upper | Yes (with stitching) |
| Heel Tab | Yes |
| Extended Toe Cap | Yes |
| Perforations | Yes |
| Placement and Proportion of Elements in Relation to Each Other | Yes |

194.    In doing so, Oliver Cabell guarantees that consumers encountering the Vegan 481 either at point of sale or in the post-sale context are substantially likely to be confused, mistaken, and/or deceived as to the source, sponsorship, affiliation, and/or other relationship between Reebok and its Crosscheck Mark, Window Box Mark, Stripecheck Mark, and CLUB C Trade Dress, on the one hand, and Oliver Cabell and its Vegan 481, on the other hand.

**D.    Oliver Cabell's Additional Attempts to Associate the Infringing Shoes with Reebok**

195.    Beyond mimicking Reebok's Crosscheck Mark, Stripecheck Mark, Window Box Mark, H-Strap Mark, and the Reebok Trade Dresses, Oliver Cabell has taken additional affirmative steps, including those identified above, in an attempt to sow confusion.

196.    For instance, as noted previously, Oliver Cabell intentionally promotes and markets its shoes as "retro-inspired" and evocative of the 1980s, the decade in which Reebok released the CLASSIC LEATHER, CLUB C, and WORKOUT PLUS shoes.

197.    Upon information and belief, Oliver Cabell also intentionally and deliberately targets the same consumers and prospective consumers as Reebok.

198.    Oliver Cabell has also used social media to advertise its Infringing Shoes to consumers who, upon information and belief, trigger or meet certain factors in advertising

algorithms—such as, for example, the consumers' internet search histories—that indicate the consumers' interest in purchasing Reebok's products or other, similar footwear.

199.    Even Oliver Cabell's presentation of the Infringing Shoes on its website mirrors the presentation of the Reebok's own shoes, as shown in the below comparison.



*Reebok's Website*



*Oliver Cabell's Website*

200. The Oliver Cabell website also specifically highlights the infringing features of the Reebok Trade Dresses copied in its Infringing Shoes in the dropdown menu that visitors to its website use to select shoes for purchase, as shown below (emphasis on relevant silhouettes added).



201. Additionally, as shown in the above silhouettes, while most of the sneakers sold by Oliver Cabell include a ¾ "O" on the sidewall of the shoe upper (see below example), which

presumably stands for "Oliver Cabell," none of the Infringing Shoes contain the same logo, only further confirming Oliver Cabell's intent to purposefully confuse and deceive consumers as to the source and/or sponsorship of the Infringing Shoes.



202.    Nor does Oliver Cabell's attempts to market itself as a luxury fashion brand avoid consumer confusion.  Indeed, Reebok has partnered with renowned fashion brands such as Maison Margiela to release iterations of the Reebok Classics that are very similar to Oliver Cabell's Infringing Shoes, as shown by the below comparison, and that also sell at a similar price point to Oliver Cabell's shoes.






*Maison Margiela CLUB C "Memory of Shoes"*
*($210-305)*          *Oliver Cabell's Vegan 481*
*($164-205)*

203.    In fact, Oliver Cabell specifically compares itself to Maison Margiela when advertising the prices of its shoes as "fair," thereby targeting one of Reebok's most notable collaborators.



204.    Together with its blatant copying of Reebok's trade dress and trademark rights, the above actions by Oliver Cabell demonstrate its willful disregard for Reebok's intellectual property and its intentional and deliberate attempts to capitalize on the goodwill that Reebok has built in its asserted trade dresses and trademarks over decades for its own financial gain.

## X.    INJURIES TO REEBOK AND THE PUBLIC

205.    The scope of Oliver Cabell's existing and imminently planned infringement cannot be overstated.  Indeed, Oliver Cabell has announced its intent to ship the infringing Bball Lo in November 2022 and its Vintage Runner in January 2023, threatening to undermine and irreparably harm Reebok's release of its own shoes, including shoes featuring the asserted trademarks and trade dresses, for the spring-summer 2023 season.

206.    Without permission, authorization, or consent from Reebok, Oliver Cabell has infringed Reebok's trademarks and trade dress rights by designing, making, using, promoting,

advertising, selling, and/or offering to sell the Infringing Shoes that are confusingly similar to Reebok's trademarks and trade dresses.

207.   Oliver Cabell has aggressively marketed the Infringing Shoes that plainly incorporate Reebok's protected trademarks and trade dresses.

208.   Oliver Cabell has not only maintained a website (http://www.olivercabell.com) that advertises and sells the Infringing Shoes to consumers, but, upon information and belief, has also purchased advertisements targeted directly at the social media accounts and websites visited by consumers and potential consumers of Reebok's shoes.

209.   Oliver Cabell's extensive marketing of the Infringing Shoes has resulted in significant media coverage.

210.   Articles about the Infringing Shoes have been published by *Us Weekly*, *Valet*, and *Fashionista*, among others.  Copies of these articles are attached as **Exhibit 13**.

211.   Oliver Cabell created the infringing shoe designs and related logos well after Reebok acquired the trademarks and trade dress rights asserted herein, and long after Reebok established itself as one of the most popular footwear companies in the world.

212.   Oliver Cabell engaged in this conduct with full knowledge of Reebok's rights, and in a knowing and willful effort to violate those rights.

213.   The Infringing Shoes produced, distributed, marketed, promoted, offered for sale, and sold by Oliver Cabell are not made by Reebok.  Nor are Oliver Cabell's products associated, affiliated, or connected with Reebok, or licensed, authorized, sponsored, endorsed, or approved by Reebok in any way.

214.   The likelihood of confusion, mistake, and deception engendered by Oliver Cabell's infringement of Reebok's trademarks and trade dress is causing irreparable harm to the goodwill

symbolized by the marks and trade dresses and the reputation for originality, authenticity, and quality that they embody.

215.    As noted above, Oliver Cabell's activities are likely to cause confusion before, during, and after the time of purchase because consumers, prospective purchasers, and others viewing Oliver Cabell's Infringing Shoes at the point of sale or post-purchase are likely—due to Oliver Cabell's use of confusingly similar imitations of Reebok's trademarks and trade dresses— to mistakenly attribute the Infringing Shoes to Reebok.

216.    By causing a likelihood of confusion, mistake, and deception, Oliver Cabell is inflicting irreparable harm on Reebok and damaging its reputation.

217.    Indeed, consumers have already either been confused by and/or recognized the confusing similarity between Oliver Cabell's Infringing Shoes and Reebok's asserted trade dresses and trademarks.  For example, consumers commenting on the below Instagram post by Oliver Cabell featuring the infringing Vegan 481 shoes refer to Reebok and Reebok's CLUB C Trade Dress:





218.    Other social media posts by Oliver Cabell have drawn the same comparisons, as shown below:







219.    The false association with Oliver Cabell created by its willful infringement also threatens to harm, and has in fact harmed, Reebok's reputation for high quality collaborations. Reebok carefully selects its collaboration partners to maintain its brand image and to reach specific audiences.  Accordingly, Reebok ensures that its partners embody the same values conveyed by its trademarks and trade dresses.

220.    Oliver Cabell does not meet the same high standards that Reebok looks for in a collaboration partner.  As just one example, Oliver Cabell's consumer ratings have been consistently low, including 1- and 2-star ratings out of 5 stars on consumer rating websites Trustpilot and the Better Business Bureau, respectively.  *See* **Exhibit 14**.  Consumer feedback on Oliver Cabell's social media posts has also been largely critical of the company and the quality of its shoes, as illustrated by the below non-limiting examples.





221.    As reflected by the above consumer ratings and feedback, the physical quality of Oliver Cabell's Infringing Shoes is also far below the standard Reebok has become known for.  As just one example, the toe cap of a Vegan 481 purchased from Oliver Cabell's brick-and-mortar store in New York was lumpy, indicating poor shoe upper and backing materials, while Reebok's CLUB C has no lumpiness, as shown by the below comparison:



*CLUB C Toe Cap*                            *Vegan 481 Toe Cap*

222.    The Vegan 481 also lacks heel counter support, which, upon information and belief, causes the shoe to lose shape and break down over time and results in an inconsistent fit between wears.

223.    The stitching along the edge of the eyestay on the Vegan 481 is both applied inconsistently around the eyestay and is applied too tightly to the shoe upper material, such that, upon information and belief, the shoe upper is weakened and will wear more out than the materials

in Reebok's shoes. Overall, the workmanship on the Oliver Cabell shoe is below Reebok's quality standards.



*Vegan 481 Eyestay Stitching*

224.    Oliver Cabell's sale of the Infringing Shoes therefore threatens to harm, and in fact harms, Reebok's reputation for producing high quality, high value shoes by misleading consumers into believing that Reebok is the source and/or sponsor of Oliver Cabell's lower quality, lower value copycats of Reebok's classic designs.

225.    Additionally, Oliver Cabell's conduct irreparably harms Reebok's ability to control when its products are released, how they are released, and in what quantity they are released.  As noted above, Reebok intentionally manages its shoe releases, including the CLASSIC LEATHER, CLUB C, and WORKOUT PLUS, on a cyclical schedule that builds demand for its products and ensures the market is not saturated with too many iterations and colorways.  By releasing the Infringing Shoes, Oliver Cabell undermines and irreparably harms Reebok's ability to manage the release of its shoes, flooding the market with lower quality, confusingly similar knockoffs.

226.     Upon information and belief, the irreparable harm from Oliver Cabell's saturation of the market with the Infringing Shoes is imminent and likely to escalate, as Oliver Cabell has not yet shipped the infringing Bball Lo and Vintage Runner to its customers.  Oliver Cabell's website states that the shoes will ship in November and January, respectively.  The threatened and imminent release of these Infringing Shoes is timed ahead of the spring-summer 2023 season, when Reebok launches new colorways and iterations of its shoes, including the asserted trade dresses.  The planned release of the Bball Lo and Vintage Runner will therefore preempt and undermine Reebok's own release of designs and colorways of the WORKOUT PLUS and CLASSIC LEATHER Trade Dresses that Oliver Cabell's shoes intentionally copy.

## XI.   OLIVER CABELL'S FALSE ADVERTISING AND DECEPTIVE TRADE PRACTICES

227.     Upon information and belief, Oliver Cabell has also made false or misleading statements in its commercial advertisements and promotional materials regarding the nature, characteristics, qualities, and/or geographic origin of its shoes, including the Infringing Shoes, by falsely claiming in its advertising and marketing materials that its shoes are made in Italy and that they are "hand crafted, European-made, and affordable premium shoes [made] using old-school shoemaking methods," as shown in the non-limiting promotional material below.



228.    Although Oliver Cabell claims the Infringing Shoes are "made in Italy," upon information and belief, Oliver Cabell in fact manufactures its shoes in countries other than Italy, including Asia and South America.  For instance, import records such as the bill of lading below show that Oliver Cabell imports shoes from a shipper in Taiwan through the Panama Canal, which would not be required for shoes arriving from Europe to Boston:



229.    Moreover, as shown below, only the outsole and insole of Oliver Cabell's Infringing Shoes includes a "Made in Italy" designation, while the inside of the tongue of the shoe—where the country of origin for a shoe is typically placed—contains no country-of-origin designation, suggesting the shoes themselves are not actually made in Italy.



*Vegan 481 Tongue*                    *Vegan 481 Outsole*



*Vegan 481 Insole*

230.    Additionally, although Oliver Cabell claims its shoes are "hand stitched" and constructed using "old-school shoemaking methods," upon information and belief and based on a review of a sample Vegan 481, Oliver Cabell's shoes are in fact made using modern, conventional methods of shoemaking using machine stitching.

231.    For instance, the stitching on the Vegan 481 purchased from Oliver Cabell's New York store pierces several layers of material in a tightly wound configuration that is not indicative of hand stitching.



*Vegan 481 Eyestay Stitching*

232.    As shown in the above image, the Vegan 481 also lacks the irregularities and purposeful imperfections of hand-stitching, instead featuring tight—albeit imprecise—stitching indicative of a machine-run process.

233.    Moreover, while Oliver Cabell claims on its website that its shoes feature rubber outsoles, the soles themselves appear on their face to be made—and, upon information and belief, are in fact made—from a polyurethane or other non-rubber material.

OUR FACTORIES

LEATHER TANNERY

MARGOM — OUTSOLE FACTORY

THE WORKSHOP



**⌃ MARGOM (EST. 1952) – LE MARCHE, ITALY**

The simplest shapes often require the most detail. To create the timeless, low profile look we wanted for the sole of this sneaker, we needed a partner that could craft outsoles the old way, yet marry it with the latest technology. Our initial attempts to work with Margom were difficult due to our lower volume. However, after some persistence and a few introductions we forged a partnership. Founded in 1952 with just two machines and five employees, Margom has become the premier provider for luxury rubber outsoles. Its lightweight design is longer lasting and resistant to splitting and abrasion, and it uses a Shore 70A rubber durometer rating for maximum comfort and longevity. The result: a comfortable outsole that stands the test of time.



*Vegan 481 Outsole*

234.    Upon information and belief, Oliver Cabell is willfully misrepresenting to consumers in this District and across the United States that its shoes, including the Infringing Shoes, originate in Italy and/or are handmade and feature rubber soles, when that is not the case.

<u>COUNT I</u>
**Federal Trademark Infringement (15 U.S.C. § 1114)**

235.    Reebok repeats and incorporates by reference the allegations in the preceding paragraphs.

236.    Reebok's Stripecheck Mark and H-Strap Mark are valid, protectible, federally registered incontestable marks that belong to Reebok.

237.    Oliver Cabell has knowingly used and continues to use in commerce, without Reebok's permission or authorization, Reebok's asserted trademarks, and/or confusingly similar marks, in connection with products that Oliver Cabell designs, manufactures, imports, distributes, promotes, advertises, offers for sale, and/or sells in the United States, namely the Infringing Shoes.

238.    Oliver Cabell's use of Reebok's trademarks has caused and is likely to cause confusion, deception, and mistake by creating the false and misleading impression that Oliver Cabell's goods are produced or distributed by Reebok, or are associated or connected with Reebok, or have the sponsorship, endorsement, or approval of Reebok.

239.    Oliver Cabell's Infringing Shoes are confusingly similar to Reebok's federally registered marks in violation of 15 U.S.C. § 1114.  Oliver Cabell's activities are causing and, unless enjoined by this Court, will continue to cause a likelihood of confusion and deception of members of the trade and public, and, additionally, injury to Reebok's goodwill and reputation as embodied in the Reebok's marks, for which Reebok has no adequate remedy at law.

240.    Oliver Cabell's actions demonstrate an intentional, willful, and malicious intent to trade on the goodwill associated with Reebok's marks to Reebok's great and irreparable harm.

241.    Oliver Cabell caused and is likely to continue causing substantial injury to the public and to Reebok, and Reebok is entitled to injunctive relief and to recover Oliver Cabell's profits, actual damages, enhanced profits and damages, costs, and reasonable attorneys' fees under 15 U.S.C. §§ 1114, 1116, and 1117.

## COUNT II
**Federal Trade Dress Infringement, False Designation of Origin, and Unfair Competition (15 U.S.C. § 1125(a))**

242.    Reebok repeats and incorporates by reference the allegations in the preceding paragraphs.

243.    Reebok's Window Box Mark, Stripecheck Mark, H-Strap Mark, and Crosscheck Mark (the "Reebok Marks") are distinctive identifiers of the source that consumers identify with Reebok, and each has enjoyed secondary meaning prior to Oliver Cabell's actions addressed by the Complaint and continue to enjoy secondary meaning today.

244.    Reebok's WORKOUT PLUS Trade Dress, CLUB C Trade Dress, and CLASSIC LEATHER Trade Dress (the "Reebok Trade Dresses") are distinctive identifiers of source that consumers identify with Reebok, and each has enjoyed secondary meaning prior to Oliver Cabell's actions addressed by the Complaint and continue to enjoy secondary meaning today.

245.    The combination of elements comprising the respective Reebok Trade Dresses serves no function other than as a signifier of the Reebok brand. The Reebok Trade Dresses are not essential to the use or purpose of their respective shoes, do not reduce the cost or improve performance of the shoe, and their use by Reebok does not put competitors at any significant non-reputation-related disadvantage. Competitors have available a multitude of alternative shoe designs they could use.

246.     Based on extensive marketing, promotion, and use, the Reebok Trade Dresses and Reebok Marks have acquired distinctiveness and enjoy secondary meaning among consumers, instantly identifying Reebok as the source of the products with which they are used.

247.     Oliver Cabell has knowingly used and continues to use in commerce, without Reebok's permission or authorization, the Reebok Marks and the Reebok Trade Dresses, and/or confusingly similar marks and trade dresses, in connection with products that Oliver Cabell designs, manufactures, imports, distributes, promotes, advertises, offers for sale, and/or sells in the United States, namely the Infringing Shoes.

248.     Oliver Cabell's use of the Reebok Marks and/or Reebok Trade Dresses, and/or confusingly similar marks and trade dresses, has caused and is likely to cause confusion, deception, and mistake by creating the false and misleading impression that Oliver Cabell's goods are produced or distributed by Reebok, or are affiliated, connected, or associated with Reebok, or have the sponsorship, endorsement, or approval of Reebok.

249.     Oliver Cabell has made false representations, false descriptions, and false designations of, on, or in connection with its goods in violation of 15 U.S.C. § 1125(a). Oliver Cabell's activities have caused and, unless enjoined by this Court, will continue to cause a likelihood of confusion and deception of members of the trade and public, and, additionally, injury to Reebok's goodwill and reputation as embodied in the marks, for which Reebok has no adequate remedy at law.

250.     Oliver Cabell's actions demonstrate an intentional, willful, and malicious intent to trade on the goodwill associated with Reebok's intellectual property and to the great and irreparable injury of Reebok.

251.    Oliver Cabell's conduct has caused, and is likely to continue causing, substantial injury to the public and to Reebok. Reebok is entitled to injunctive relief and to recover Oliver Cabell's profits, actual damages, enhanced profits and damages, costs, and reasonable attorneys' fees under 15 U.S.C. §§ 1125(a), 1116, and 1117.

## COUNT III
### Federal False Advertising (15 U.S.C. § 1125(a))

252.    Reebok repeats and incorporates by reference the allegations in the preceding paragraphs.

253.    Upon information and belief, Oliver Cabell has made false and/or misleading statements of fact in its promotional and advertising materials, including the advertising and promotions on its website, regarding the nature, characteristics, qualities, and/or geographic origin of its goods.  Specifically, Oliver Cabell has deceived and misled the public by falsely stating that its shoes are made in Italy, when they are not; that its shoes are hand-stitched and made using "old-school shoemaking methods," when they are not; and that its shoes feature rubber outsoles, when they do not.

254.    Instead, upon information and belief, Oliver Cabell's shoes, including the Infringing Shoes, originate from and are made in countries other than Italy and/or are not hand-stitched, and are instead made using modern methods of shoemaking.  Further, upon information and belief, the outsoles of Oliver Cabell's shoes are not made from rubber.

255.    Oliver Cabell's false and misleading statements have deceived and/or are likely to deceive consumers in a material way, in that consumers are likely to rely on Oliver Cabell's statements regarding the origin of its shoes and the process and quality of their construction in deciding whether to buy Oliver Cabell's products.

256.     Oliver Cabell's false and misleading statements of material fact have caused, and are likely to continue causing, substantial injury to the public and to Reebok, including by harming Reebok's reputation and undermining Reebok's competitive position. Reebok is entitled to injunctive relief and to recover Oliver Cabell's profits, actual damages, enhanced profits and damages, costs, and reasonable attorneys' fees under 15 U.S.C. §§ 1125(a), 1116, and 1117.

**COUNT IV**
**Massachusetts Deceptive and Unfair Trade Practices (Mass. Gen. Laws ch. 93A)**

257.     Reebok repeats and incorporates by reference the allegations in the preceding paragraphs.

258.     Oliver Cabell's intentional and knowing use of the Reebok Marks and Reebok Trade Dresses in the United States in connection with the Infringing Shoes, and its statements regarding the nature, characteristics, qualities, and/or geographic origin of those shoes, is materially deceptive.

259.     Oliver Cabell's use of the Reebok Marks and Reebok Trade Dresses and false and misleading statements are made in connection with the advertising, offer for sale, and sale of products and is directed primarily and substantially within Massachusetts, including because Reebok is headquartered in Massachusetts; Oliver Cabell imports, stores, and distributes the Infringing Shoes and other products sold in connection with its deceptive advertising in Massachusetts; and Oliver Cabell directs its advertising at customers and prospective customers in Massachusetts, in addition to the entire United States.

260.     These commercial advertisements and statements have and will continue to cause the loss of goodwill and the loss of current and prospective customers of Reebok who, but for the false and misleading advertisements and statements made by Oliver Cabell, would conduct business with Reebok or its authorized licensees.

261.     Reebok has been and will continue to be irreparably harmed unless Oliver Cabell's use of the Reebok Marks and Reebok Trade Dresses in the United States in connection with the Infringing Shoes is enjoined.

262.     Oliver Cabell's deceptive and unfair trade practices justify an increase in damages up to three times the amount awarded in compensatory damages, plus reasonable attorneys' fees, as permitted under Chapter 93A.

## COUNT V
### Common Law Trademark Infringement and Unfair Competition

263.     Reebok repeats and incorporates by reference the allegations in the preceding paragraphs.

264.     Reebok is the owner of all rights and title to, and has valid and protectable prior rights in, the asserted trademarks and trade dress rights.

265.     Reebok engages in the sale and distribution of footwear and apparel, employing the asserted trademarks and trade dress rights in the Commonwealth of Massachusetts and has done so since long before Oliver Cabell began its infringing use of Reebok's marks as alleged herein.

266.     The Reebok Marks are inherently distinctive, and both the Reebok Marks and Reebok Trade Dresses enjoy secondary meaning among consumers based on extensive marketing, promotion, and use, instantly identifying Reebok as the source of the products with which they are used.

267.     Oliver Cabell has reproduced, copied, and imitated the Reebok Marks and Reebok Trade Dresses in connection with advertising, promoting, offering to sell, and/or selling footwear bearing infringing marks and trade dresses, in competition with Reebok and without Reebok's consent.

268.    Oliver Cabell's use of confusingly similar imitations of the Reebok Marks and Reebok Trade Dresses has caused and is likely to cause confusion, deception, and mistake by creating the false and misleading impression that Oliver Cabell's goods are produced or distributed by Reebok, or are affiliated, connected, or associated with Reebok, or have the sponsorship, endorsement, or approval of Reebok.

269.    Upon information and belief, Oliver Cabell's acts of common law trademark infringement and unfair competition have been willful and deliberate and committed in bad faith, and Oliver Cabell has and will continue to profit and be unjustly enriched by sales that Oliver Cabell would not otherwise have made but for its unlawful conduct.

270.    Oliver Cabell's willful and deliberate acts described herein have caused injury and damage to Reebok and irreparable injury to Reebok's goodwill and reputation, and, unless enjoined, will cause further irreparable injury, whereby Reebok has no adequate remedy at law. Reebok is therefore entitled to injunctive relief.

271.    Reebok is also entitled to its actual damages, Oliver Cabell's profits, and an award of costs and attorneys' fees.

## **PRAYER FOR RELIEF**

Reebok respectfully requests that the Court enter judgment in its favor and against Oliver Cabell as follows:

1.    Oliver Cabell and all of its agents, officers, employees, representatives, successors, assigns, attorneys, and all other persons acting for, with, by, through or under authority from Oliver Cabell, or in concert or participation with Oliver Cabell, and each of them be preliminarily and permanently enjoined from:

a.      advertising, marketing, promoting, offering for sale, distributing, or selling the Infringing Shoes;

b.      using Oliver Cabell's infringing imitation of the Window Box Mark, Stripecheck Mark, the Crosscheck Mark, and/or the H-Strap Mark, or any mark confusingly similar thereto, on or in connection with any of Oliver Cabell's goods or services;

c.      using Oliver Cabell's infringing imitation of the Reebok Trade Dresses, or any trade dresses similar thereto, on or in connection with any of Oliver Cabell's goods or services;

d.      using Reebok's Window Box Mark, Stripecheck Mark, H-Strap Mark, Crosscheck Mark, CLASSIC LEATHER Trade Dress, CLUB C Trade Dress, and/or WORKOUT PLUS Trade Dress, or any of Reebok's registered trademarks, or any other copy, reproduction, colorable imitation, or simulation of Reebok's marks or trade dresses on or in connection with Oliver Cabell's goods or services;

e.      using any trademark, name, logo, design, or source designation of any kind on or in connection with Oliver Cabell's goods or services that is a copy, reproduction, colorable imitation, or simulation of, or confusingly similar to any of Reebok's trademarks, trade dresses, names, or logos;

f.      using any trademark, name, logo, design, or source designation of any kind on or in connection with Oliver Cabell's goods or services that is likely to cause confusion, mistake, deception, or public misunderstanding that such goods or services are produced or provided by Reebok, or are sponsored or

authorized by Reebok, or are in any way connected or related to Reebok; and

g.    passing off, palming off, or assisting in passing off or palming off Oliver Cabell's goods as those of Reebok, or otherwise continuing any and all acts of unfair competition as alleged in this Complaint.

2.    Oliver Cabell be ordered to cease offering for sale, marketing, promoting, and selling and to recall all infringing footwear, or any other goods bearing Oliver Cabell's confusingly similar imitation marks and trade dresses that are in Oliver Cabell's possession or have been shipped by Oliver Cabell or under its authority, to any store, affiliate, subsidiary, business, wholesaler, distributor, retailer, or marketer, and also to deliver to each such entity a copy of this Court's order as it relates to said injunctive relief against Oliver Cabell;

3.    Oliver Cabell be ordered to deliver up for impoundment and for destruction, all infringing footwear, bags, boxes, labels, tags, signs, packages, receptacles, advertising, sample books, promotional materials, stationery, or other materials in the possession, custody or under the control of Oliver Cabell that are found to adopt, infringe, or misappropriate Reebok's trademarks or that otherwise unfairly compete with Reebok and its products;

4.    Oliver Cabell be compelled to account to Reebok for any and all profits derived by Oliver Cabell from the sale or distribution of the infringing footwear;

5.    Oliver Cabell be compelled to account for any and all profits derived by Oliver Cabell from the sale or distribution of other products while using Reebok's

trademarks or trade dress rights, and/or confusingly similar marks, to advertise such products;

6.  Reebok be awarded all damages caused by the acts forming the basis of this Complaint;

7.  Based on Oliver Cabell's knowing and intentional use of a confusingly similar imitation of Reebok's trademarks and trade dress rights, the damages awarded be trebled and the award of Oliver Cabell's profits be enhanced as provided for by 15 U.S.C. § 1117(a);

8.  Oliver Cabell be required to pay to Reebok the costs, expenses, and reasonable attorneys' fees incurred by Reebok in this action pursuant to 15 U.S.C. § 1117(a), 28 U.S.C. § 1920, and Massachusetts Gen. Laws ch. 93A;

9.  Based on Oliver Cabell's willful and deliberate infringement of Reebok's trademarks and trade dress rights, and to deter such conduct in the future, Reebok be awarded punitive damages;

10. Reebok be awarded damages, including punitive damages, and attorneys' fees for Oliver Cabell's deceptive and unfair trade practices under Mass. Gen. Laws ch. 93A;

11. Reebok be awarded restitution for Oliver Cabell's unjust enrichment;

12. Reebok be awarded prejudgment and post-judgment interest on all monetary awards; and

13. Reebok be granted such other and further relief as the Court may deem just.

## JURY DEMAND

Reebok hereby demands a trial by jury on all claims and issues so triable.


Dated: November 7, 2022                                Respectfully submitted,

                                                       /s/ *Jamie N. Dalton*

                                                       Jamie N. Dalton (BBO # 675597)
                                                       Stacey C. Friends (BBO # 647284)
                                                       Paige Zacharakis (BBO # 699108)
                                                       **MORSE, BARNES-BROWN &**
                                                       **PENDLETON, P.C.**
                                                       CityPoint
                                                       480 Totten Pond Road, 4th Floor
                                                       Waltham, MA 02451
                                                       Telephone: (781) 622-5930
                                                       Fax: (781) 622-5933
                                                       jdalton@morse.law
                                                       sfriends@morse.law
                                                       pzacharakis@morse.law

                                                       Lucy Jewett Wheatley (*pro hac vice*
                                                       forthcoming)
                                                       Amanda L. DeFord (*pro hac vice*
                                                       *forthcoming*)
                                                       Matthew G. Rosendahl (*pro hac vice*
                                                       *forthcoming*)
                                                       **McGuireWoods LLP**
                                                       800 East Canal Street
                                                       Richmond, VA 23219
                                                       Tel:  (804) 775-1000
                                                       Fax: (804) 698-2016
                                                       lwheatley@mcguirewoods.com
                                                       adeford@mcguirewoods.com
                                                       mrosendahl@mcguirewoods.com

                                                       *Counsel for Plaintiffs Reebok International*
                                                       *Ltd., LLC and Reebok International Limited*